Filed 5/16/23  P. v. Ulloa CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL ULLOA,<br><br>    Defendant and Appellant. | F082814<br><br>(Super. Ct. No. LF012047B)<br><br><br>**ORDER MODIFYING OPINION**<br>**[NO CHANGE IN JUDGEMENT]** |

**THE COURT:**

It is so ordered that the opinion filed on May 5, 2023, be modified as follows:

1.  The first sentence of the last paragraph on page 2 and carrying over to page 3 beginning "Ulloa was sentenced …" is deleted and replaced with the following sentence:

Ulloa was sentenced to 17 years and six months, consisting of the upper term of five years, six months, for count 1 (attempted manslaughter), plus four years for the gun enhancement (§ 12022.5, subd. (a)), three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), and five years for the gang enhancement (§ 186.22, subd. (b)(1)).

2.  On page 3, footnote 3 is deleted in its entirety, which will require renumbering of all subsequent footnotes.

There is no change in the judgment.

FRANSON, J.

**WE CONCUR:**

HILL, P. J.
SMITH, J.

Filed 5/5/23  P. v. Ulloa CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>DANIEL ULLOA,<br><br>        Defendant and Appellant. | F082814<br><br>(Super. Ct. No. LF012047B)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Daniel Ulloa was charged in count 1 with premeditated attempted murder of Roberto Hernandez (Pen. Code, §§ 664, 187, subd. (a), 189)[1]; in counts 2, 3, and 4 with assault with a firearm (§ 245, subd. (a)(2)); in counts 5, 6, and 7 with false imprisonment by violence (§ 237); and in count 8 with active participation in a criminal street gang (§ 186.22, subd. (a)). It was alleged that the charged felonies were for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); that count 1 involved personal use of a firearm resulting in great bodily injury (§ 12022.53, subd. (d)), intentional and personal discharge of a firearm during the attempted murder (§ 12022.53, subd. (c)), and infliction of great bodily injury (§ 12022.7, subd. (a)); and that counts 2 through 8 involved personal use of a firearm (§ 12022.5, subd. (a)).[2]

A jury acquitted Ulloa of attempted murder and premeditation, as alleged in count 1, and convicted him of the lesser offense of attempted voluntary manslaughter (§§ 664/192) with personal discharge of a firearm resulting in great bodily injury (§ 12022.53, subd. (d)), intentional and personal discharge of a firearm (§ 12022.53, subd. (c)), and personal infliction of great bodily injury (§ 12022.7, subd. (a)). It found him guilty of assault with a firearm as alleged in count 2, with personal use of a firearm (§ 12022.5, subd. (a)). As to both counts 1 and 2, the jury found true the gang enhancement allegations (§ 186.22, subd. (b)(1)).

The jury acquitted Ulloa of assault with a firearm in counts 3 and 4, and found him guilty of the lesser offense of simple assault (§ 240) on count 3. Ulloa was acquitted of counts 5, 6, and 7. He was found guilty of count 8, participating in a criminal street gang, with personal use of a firearm (§ 12022.5, subd. (a)).

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

[2]     Codefendant Ricardo Villasenor was charged with the same felonies, plus gang and gun enhancements as alleged in counts 2 through 8, plus a misdemeanor offense of carrying a concealed weapon. Villasenor has filed a separate appeal (case No. F082847).

2.

Ulloa was sentenced to 17 years and six months consisting of the upper term of five years, six months, for count 1 (attempted manslaughter), plus four years plus three years for two gun enhancements (§§ 12022.5, subd. (a); 12022.7, subd. (a)), and five years for the gang enhancement (§ 186.22, subd. (b)(1)).[3] He was sentenced to the upper term of four years for count 2 (assault with a firearm), plus five years for the gang enhancement (§ 186.22, subd. (b)(1)), and 10 years for the gun enhancement (§ 12022.5, subd. (a)). And he was sentenced on count 8 (gang substantive offense) with the upper term of three years, plus a firearm enhancement (§ 12022.5, subd. (a)) of 10 years. Counts 2 and 8 were stayed pursuant to section 654. Ulloa received a 180-day jail term for the misdemeanor assault in count 3.

On appeal, we reject Ulloa's claims that the trial court erred when it denied bifurcation of the gang evidence. We find no prejudicial ineffective assistance of counsel. We disagree that there was insufficient evidence of the gang substantive offense and gang enhancements under law as it existed at the time. We agree that the gang enhancement allegations and gang substantive offense must be reversed in light of newly amended law and remand to allow the prosecutor to retry those allegations. We also agree that remand is necessary to allow the trial court to use its discretion in sentencing Ulloa pursuant to newly amended section 1170. We reject Ulloa's claims that the trial court erred when it admitted statements made by codefendant Villasenor in an earlier

---

**3** There is some confusion in the record regarding the verdict form and sentence imposed in count 1. As noted, Ulloa was acquitted of the murder charge but found guilty of the lesser offense of attempted voluntary manslaughter. The verdict forms for the lesser offense on count 1 also found true two firearm allegations: sections 12022.7, subdivision (a) and 12022.53, subdivision (d). He was sentenced on count 1 on two firearm allegations – one pursuant to section 12022.5, subdivision (a) and the other pursuant to section 12022.7, subdivision (a). Section 12022.53, subdivision (d), which was included in the verdict form, is not applicable to a charge of attempted voluntary manslaughter, but section 12022.5, which was not included on the verdict form but which the trial court sentenced Ulloa on, is. This is an issue that can be addressed on remand for resentencing.

3.

incident in violation of *Miranda*[4]; when it denied Villasenor's motion for mistrial, and when it did not allow the defense to question the immigration status of the victims. In all other respects, we affirm.

## STATEMENT OF THE FACTS

*July 26, 2018, Incident at the Corral*

On July 26, 2018, Luis S. and brothers Roberto H. and Juan H. went to a corral on Fallbrook Avenue in Arvin so that Roberto could tend to his chickens. Luis and Juan helped Roberto maintain and clean the area where the chickens were kept.[5] After they finished cleaning, the three continued to talk and drink.

Villasenor came over with one or two others from an adjacent stall in the corral and joined them in drinking beer. At some point, Villasenor left and returned with Ulloa. Villasenor showed off a firearm, which he unloaded and reloaded. The men were arm wrestling, and some of the men attempted to make the loser pay for more beer, but not all agreed to that. According to Roberto, Luis won all the matches. But after one of the matches, someone claimed Luis lost and owed them more beer. Luis, Roberto and Juan were ready to go home. Luis did not want to pay for more beer, so declined and prepared to leave with Roberto and Juan.

Suddenly, Ulloa hit Luis in the jaw with a closed fist. Roberto then hit Ulloa once, after which Villasenor hit Roberto in the face. Roberto tried to defend himself, but Villasenor kept hitting him. When Luis went over to Ulloa to try to find out why he had hit him, Ulloa pulled out a gun and pointed it at Luis's chest. Luis ran and hid. Ulloa ran out of the area.

---

[4]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[5]     There was conflicting evidence at trial as to whether the men were engaged in rooster fighting, which is not relevant to incident at issue.

Roberto and Villasenor stopped fighting, and Villasenor made a phone call and then told Luis that Ulloa would come back to fight him. Luis, Roberto and Juan wanted to leave, but Villasenor stood by the exit with his gun "pointing it but lower down," and told them they had to stay to fight Ulloa.

When Ulloa returned a few minutes later, he brought Loreto Mosqueda[6] with him. Ulloa pointed at Roberto and said, "It's him," and Mosqueda then started hitting Roberto in the face. During the fight, Ulloa moved behind Roberto and tried to shoot him in the back, but Luis intervened. Villasenor still had the gun in his hand and told Luis and the others not to get involved in the fight. Luis was told that, if he did, Ulloa would "fill [him] up with bullets."

Ulloa then turned towards Luis and pointed the gun at his chest. Luis pushed Ulloa's arm down to lower the gun, but Ulloa fired the gun, missing Luis. Luis ran and hid.

Within a few seconds, Ulloa pointed the gun at Roberto, who had Mosqueda on the ground. Roberto attempted to get Ulloa to calm down, but Ulloa shot Roberto in the leg, which broke the leg. Villasenor, Ulloa, and Mosqueda then fled. Roberto told his brother Juan to call 911, but Juan did not speak English, so Roberto then told Juan to call Jose C., the owner of the corral, who in turn called 911.

Juan showed police officers a cell phone video recording of the men arm wrestling.[7] One of the officers, who had been a resource officer at Ulloa's middle school from 2013-2017, recognized Ulloa in the video. When officers spoke to Luis after the incident, Luis did not know if the perpetrators were gang members, but he referred to them as gang members.

Two spent .45-caliber shell casings were found on the ground in the corral area.

---

**6** By the time of trial, Mosqueda was deceased.

**7** The video was played for the jury.

Officers were provided the license plate of a vehicle associated with the suspects, and Villasenor was arrested at a gas station three hours after the incident. A search of Villasenor's vehicle turned up a black baseball cap with "Arvin" on it, two cell phones, a live .40-caliber bullet, and a loaded .40-caliber pistol.

Ulloa was arrested on October 3, 2018, by the U.S. Marshals Fugitive Apprehension Team.

*The Arvina Gang*

Gang expert Officer Ryan Calderon testified that the only active criminal street gang in Arvin is Arvina, also known as Arvina 13, Arvin 13, Arvin Poorside, and Poorside Locos. Calderon testified that gangs commit crimes to instill fear, which obstructs rivals or citizens from reporting the gang's activity. Gang members gain respect by committing crimes.

Officer Calderon described the Arvina gang as a southern Hispanic gang whose rivals are the northern Hispanic gangs. Arvina's main rival is the Lamont 13 gang. Arvina members commonly wear dark blue, and often display the letter A and number 13. Arvina's primary activities include felony vandalism, felony assault, narcotic sales, vehicle theft, burglary, grand theft, illegal possession of firearms, assault with deadly weapons, attempted murder, and killings.

Officer Calderon testified that he came into contact with Arvina members about 10 times a week, making him familiar with gang clothing, signs, tattoos, their criminal histories and personal lives. Calderon had personally investigated at least 100 crimes committed by Arvina members.

Officer Calderon testified that a person could become an Arvina gang member by being "jumped in," which involved committing a crime, or by being "born into the gang," by family members already in the gang. Calderon opined that Arvina was an active criminal street gang at the time of the July 26, 2018, incident.

6.

_Gang Evidence Regarding Ulloa_

On February 5, 2015, officers responded to a suspected burglary and detained Ulloa, who was 15 years old at the time. Others detained were Guadalupe Cerna, Hermina Cerna, and "Lil Wyno." Ulloa, who had a three-dot tattoo on his finger, was in possession of stolen electronic equipment at the time. Officer Calderon believed Lil Wyno was an active Arvina gang member at the time.

On February 1, 2017, Officer Calderon found Ulloa in possession of a loaded gun and loaded spare magazine. Officer Calderon opined that Ulloa was an active Arvina gang member at the time.

When Ulloa was photographed just prior to trial, he had three dots tattooed on the inside of a finger, a tattoo that means "my crazy life," and can be considered gang-related, although it is also common among people with no gang connection.

Officer Calderon opined that Ulloa was an active Arvina gang member on July 28, 2018, based on Ulloa's history, possession of a firearm, association with two other Arvina gang members, and responding to disrespect by instigating an assault and summoning help.

_Gang Evidence Regarding Villasenor_

On September 3, 2014, Joe Martinez, Jesse Ruiz, and Villasenor were at Alshaif Market (at times referred to as camel store or market). Ruiz was 14 years old at the time; Villasenor was 17. Martinez, who went by "Shadow" and was wearing a black baseball hat with the letter "A", approached a man who had an "LA" tattoo and asked where he was from. A fight ensued and the male was stabbed, suffering injuries to his nose, both arms, left shoulder, and back.[8]

---

[8] The jury was admonished that Villasenor did not possess any weapons at the time or stab anyone.

Officers contacted Villasenor the following day, and he explained that a friend had asked the man where he was from, a fight started, and he got involved. Villasenor declined to name the friend. Villasenor had an "A" tattooed on his left hand, which he said he had gotten the previous day. Villasenor claimed not to know what the "A" meant, but agreed that the Arvina gang represented with the letter A. Villasenor said he was not affiliated with any gang, but confirmed that he was friends with Martinez.

Villasenor allowed officers to search his cell phone. The night of the stabbing, "Lil Isac Wyno" had texted Villasenor that somebody had been jumped at the market. Villasenor responded, "We jumped him, ese, haha." Later that night, another individual texted Villasenor and asked who let him "do the A." Villasenor responded, "I put in work and Posadas did them for me." In response to further inquiries, Villasenor sent texts indicating he, "Jay" and Martinez had "pop[p]ed the fool from L.A.," at the market. Officer Calderon believed Martinez and "Lil Wyno" were active members of the Arvina gang at the time.

At the time of trial in this matter, Villasenor no longer had the "A" tattoo on his hand. When photographed before trial, he had numerous other tattoos, including a water tower with the letter "A" and the word "Poorside" and another tattoo with the letter "A" and "Poorside." Officer Calderon believed these tattoos, and the fact that some were obtained after 2018, were consistent with ongoing membership in the Arvina gang.

Officer Calderon opined that Villasenor was an active participant in the Arvina gang on July 26, 2018. His belief was based on the 2014 incident, Villasenor's tattoos, the fact that the crime at the corral was committed with other gang members, and the location of the crime was in Arvina territory.

*Gang Evidence Regarding Mosqueda*

Officer Calderon had contacted Mosqueda 10 to 15 times.

On May 7, 2008, Mosqueda, Javier Lopez, and Andrew Carrera were contacted while drinking outside of Lopez's residence. All three had gang monikers, and Officer Calderon believed Lopez and Carrera were Arvina gang members at the time.

On July 28, 2008, Mosqueda was contacted in the presence of Jose Moreno, Alfredo Cardena, and Leonel Nunez. Officer Calderon was familiar with the crimes Moreno, Cardenas, and Nunez were suspected of committing and believed all three were Arvina gang members.

On January 22, 2009, Mosqueda left the residence of Alejandro Diaz, with Manual Pantoja in his car. Officers stopped Mosqueda, searched Diaz's home, and found a stolen vehicle, a large quantity of methamphetamine, and indicia of drug sales. Officer Calderon believed Pantoja was an active Arvina gang member at the time, but not Diaz.

On December 28, 2013, officers stopped a vehicle driven by Mosqueda; Edwardo Mosqueda, Pantoja, Oscar Partida, and Fabian Zuniga were also in the car, along with three loaded firearms, gloves, bolt cutters, and a hammer. Mosqueda had numerous Arvina gang tattoos, and officers believed Zuniga, Pantoja, and Partida were active Arvina gang members at the time.

On July 28, 2014, Mosqueda was in his garage when Miguel Arrendondo and Efrain Chocoteco began to drive away. Mosqueda remained in the garage, where officers found his wallet, a cell phone, keys, a lighter, and a .25-caliber bullet. Arredondo had an "A" tattooed on his neck, and Officer Calderon opined that he was an active Arvina member. Chocoteco had a "W" tattooed on his cheek and was a member of the Weedpatch 13 gang, a gang that is friendly with Arvina. Officer Calderon opined that Arrendondo and Chocoteco were both active Arvina gang members.

Officer Calderon opined that at the time of the current offense, July 26, 2018, Mosqueda was an active participant in the Arvina 13 gang, based on his being brought to the corral and directed, by Ulloa, to assault somebody, by his tattoos, his past participation in Arvina, and the presence of Ulloa and Villasenor.

9.

*Predicate Gang Offenses*

On August 24, 2014, active Arvina gang members Edgar Garcia and Jose Valencia shot at three males who were in a pickup truck at a car wash. A police officer was nearby, and a high-speed chase ensued. Garcia was convicted of attempted murder, assault with a firearm, and active participation in a street gang.

On January 30, 2017, Saul Ramirez drove by and shot at the residence of a known Arvina gang dropout. Ramirez was an active Arvina gang member at the time and pled guilty to assault with a firearm and a gang enhancement.

Officer Calderon opined that the charged crimes on July 26, 2018, were committed for the benefit of, at the direction of, and in association with the Arvina gang. The crime benefitted the Arvina gang by instilling fear in the community, deterring disrespect and discouraging people from reporting crimes.

## DISCUSSION

### I.    GANG ALLEGATIONS

Ulloa makes several related contentions concerning the true findings on the gang enhancement allegations and conviction of the gang substantive offense. He contends that the trial court erred when it denied his motion to bifurcate the gang evidence; that the enactment of Assembly Bill No. 333 (Assembly Bill 333), which amended section 186.22, requires reversal of the gang enhancements and gang substantive offense; and that Assembly Bill 333's newly added section 1109 (Stats. 2021, ch. 699, §§ 3, 5) requires reversal of the entire judgment. The new laws became effective January 1, 2022. (See Cal. Const., art IV, § 8, subd. (c)(1); Gov. Code, § 9600, subd. (a).)

We conclude Ulloa is entitled to reversal of the gang enhancements attached to counts 1 and 2, and substantive conviction for active participation in a criminal street gang, count 8, which the People are entitled to retry under the amended law. We further conclude the failure to bifurcate the gang allegations was harmless as to Ulloa's other convictions.

10.

*Relevant Procedural History*

Prior to trial, the prosecutor moved in limine to admit gang evidence and objected to any bifurcation or severance of gang allegations[9], stating "motive, intent, and plan of the criminal activity are so interconnected and intertwined with the gang evidence" that the gang evidence was necessary "for the jury to fully understand the incident." The prosecutor further argued that the gang evidence was admissible under Evidence Code section 352 and that emphasis should be placed on economy of judicial resources.

At the hearing on the motion, the prosecution argued that Villasenor and Ulloa had worked together to commit the crimes and secure the presence of Mosqueda, an active Arvina gang member, who assisted at Ulloa's direction. The prosecution acknowledged that no gang slurs were uttered nor gang signs flashed during the crimes, but that Mosqueda did have visible gang-related facial tattoos.

Ulloa's counsel argued for bifurcation, stating that none of the victims knew whether the crimes were gang-related or that Mosqueda's tattoos were gang-related. He further argued that there was no graffiti at the scene to indicate the Arvina gang took credit for the crimes, and there was no indication that anyone's gang status increased based on the crimes.

The prosecutor then referred to the preliminary hearing transcript, which described the purported testimony of a "victim"[10] and that he knew Ulloa's moniker. The prosecutor believed the victims were aware the defendants may be gang members, which affected how the victims reacted to the defendants' actions. The prosecutor argued that

---

[9] Ulloa's opening brief generally refers to bifurcation, which would technically apply to the gang enhancements and not the active gang participation charge. However, the motion in the trial court requested the court to "sever/bifurcate the gang charges," and we thus presume Ulloa's claim on appeal includes severance of the active gang participation offense as well.

[10] See part II. of the Discussion, *post*, on the prosecutor's use of the term "victim" in this context.

11.

the crimes "turn[ed] into being motivated by gang and gang culture, particularly the underlying facts in this case when it comes to respect, losing a fight, maybe losing a bet, then going and getting … [a] more senior gang member of Arvina" and bringing him into the fight. As argued by the prosecutor, Ulloa "assert[ed] himself to become even more associated with Arvina 13 in order to commit the escalation of these crimes from a simple possible mutual combat to now assault with a deadly weapon, a firearm, false imprisonment, and attempted murder."

Ulloa's counsel argued that the victims had "no idea who [Ulloa] was" at the time of the crimes. Villasenor's counsel argued that the statement from the preliminary hearing only references Ulloa's moniker and said nothing about Ulloa being a gang member.

The trial court reviewed the preliminary hearing testimony and, citing applicable law, determined the gang evidence was relevant and admissible. In denying the motion, the trial court stated the following:

> "Based on the People's theory and the information that I know, at this point, I am not going to bifurcate. [¶] … [¶] … I will say, after the gang expert for the People testifies this afternoon, I will think more. If there's something that changes, I will tell everybody, but, at this point, I do not believe it is appropriate to bifurcate with the appropriate instruction given to the jury as to how this information can be considered."

Later, during the hearing Ulloa's counsel renewed his request for bifurcation and severance, citing *People v. Albarran* (2007) 149 Cal.App.4th 214, which held that "certain extremely prejudicial gang evidence was not relevant to the underlying charges; the People failed to present sufficient evidence these crimes were gang motivated." (*Id.* at p. 217.)

The trial court explained that "some of the evidence" at the preliminary hearing and police report relied on by Officer Calderon had to do with identity, motive, and intent, "which is why they're intrinsically linked, which is why I'm not bifurcating." The

12.

trial court noted that, while one of the victims at the preliminary hearing did not mention believing Villasenor, Ulloa or Mosqueda were gang members, the victim "then said something like that in a report that was taken."

*Assembly Bill 333*

While Ulloa's appeal was pending, the Legislature enacted Assembly Bill 333, which, in part, amends section 186.22 to impose new substantive and procedural requirements for proving gang allegations. The legislation went into effect on January 1, 2022.

Section 186.22 prohibits unlawful participation in a criminal street gang, as set forth in subdivision (a), and includes sentencing enhancement provisions found in subdivision (b), both at issue here. (*People v. Briceno* (2004) 34 Cal.4th 451, 460, fn. 7.)

At the time of the underlying events, a criminal street gang was defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Former § 186.22, subd. (f), as amended by Stats. 2016, ch. 887, § 1; see Stats. 2013, ch. 508, § 1.)

A "pattern of criminal gang activity" was previously defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the [offenses listed in paragraphs (1) to (33)], provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons ...." (Former § 186.22, subd. (e), 1st ¶, as amended by Stats. 2016, ch. 887, § 1; see Stats. 2013, ch. 508, § 1.)

Assembly Bill 333 amended section 186.22 in several ways:

"First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' [Citation.] Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. [Citation.] Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. [Citation.] Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.)

Finally, Assembly Bill 333 also added section 1109, which requires gang enhancements charged under section 186.22, subdivisions (b) or (d) to be tried separately from the underlying charges upon request from the defense. (Stats. 2021, ch. 699, § 5.) Section 1109 also requires that the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)), be tried separately from all other counts that do not require gang evidence as an element of the crime. (§ 1109, subd. (b).)

*Ulloa is Entitled to Reversal of His Substantive Gang Conviction and Gang Enhancements*

Assembly Bill 333's amendments to section 186.22 apply retroactively to cases not yet final as of the legislation's effective date. (*People v. Tran, supra,* 13 Cal.5th at pp. 1206-1207.) Ulloa claims Assembly Bill 333's recent changes to section 186.22 require reversal of the gang substantive offense he was convicted of and the gang enhancements found true. Specifically, Ulloa claims the evidence at trial failed to support Assembly Bill 333's new requirements on the definition of a criminal street gang

14.

in three ways: it fails to show that (1) the Arvina gang members "collectively" engage in or have engaged in patterns of criminal activity; (2) that each predicate offense commonly benefitted a criminal street gang in a way that was more than reputational and (3) that the predicate offenses were committed within the required time frame  The People concede that the jury's findings on the gang allegations made at trial do not comply with the new statutory terms.  We accept the People's concession and reverse the gang enhancements allegations attached to counts 1 and 2, and the gang conviction in count 8.[11]  "The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges."  (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480; accord, *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822-823 & fn. 19.)

*The Failure to Bifurcate was Harmless*

As for Ulloa's contention that the trial court erred when it denied his motion to bifurcate and that Assembly Bill 333 requires reversal of the entire judgment because the new section 1109, concerning bifurcation and severance, applies retroactively to his case, the People disagree, arguing that section 1109 does not apply retroactively and, even if it does, Ulloa was not prejudiced by the denial of his motion to bifurcate.  We address those issues below and find no prejudicial error occurred.

The courts of appeal are split on whether section 1109 applies retroactively. (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 565-568 [holding § 1109 applies retroactively under *Estrada*], review granted July 13, 2022, S274743, and *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128-1131 [same], with *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [holding § 1109 is not retroactive], review granted Aug. 17, 2022, S275341, *People v. Boukes* (2022) 83 Cal.App.5th 937, 947-948 [same], review granted Dec. 14, 2022, S277103, and *People v. Perez* (2022) 78 Cal.App.5th 192, 207 [same],

---

[11]     Because we reverse the substantive gang offense in count 8, the firearm enhancement (§ 12022.5, subd. (a)), attached to that count is also reversed.

review granted Aug. 17, 2022, S275090.) Furthermore, in *People v. Tran, supra,* 13 Cal.5th at page 1208, the California Supreme Court declined to resolve the split, concluding any failure to bifurcate the gang allegations was harmless.

In reviewing for prejudice in *Tran*, the California Supreme Court concluded the failure to bifurcate in that case did not render the trial fundamentally unfair such that it required review under the standard for federal constitutional error articulated in *Chapman v. California* (1967) 386 U.S. 18. (*People v. Tran, supra,* 13 Cal.5th at p. 1209.) Accordingly, the court considered whether the defendant was prejudiced under the state law standard of review articulated in *People v. Watson* (1956) 46 Cal.2d 818 and concluded the defendant had failed to establish prejudice as to his guilty verdicts. (*Tran, supra,* at p. 1209.) In so holding, the *Tran* court rejected the contention the failure to bifurcate as required under section 1109 constitutes structural error. (*Tran, supra,* at p. 1208.)

Here, as in *Tran*, it is unnecessary to address the parties claims regarding retroactivity because we conclude the failure to bifurcate the proceedings was harmless. In so holding, and for the reasons discussed further, *post*, we cannot conclude the admission of the gang evidence rendered the trial "fundamentally unfair" such that it resulted in a due process violation requiring us to review for prejudice under the *Chapman* standard for constitutional error. (See *People v. Tran, supra,* 13 Cal.5th at p. 1209.)

"[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.) "The Supreme Court has emphasized

16.

'that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' " (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519.)

Applying the *Watson* standard for state law error, we cannot conclude it is reasonably probable Ulloa would have obtained a more favorable verdict in the absence of the gang evidence that would not have been presented had the gang enhancements and substantive gang offense been bifurcated. (See *People v. Watson, supra,* 46 Cal.2d at p. 836.) As in *Tran*, "[t]he case for guilt here was strong." (*People v. Tran, supra,* 13 Cal.5th at pp. 1209-1210.)

Two of the victims, Luis and Roberto, identified Villasenor and Ulloa at trial as involved in the incident.[12] Both testified that Villasenor stood by the door of the corral, gun in hand, and told them that they had to stay until Ulloa returned so he could fight them. Photographs at trial showed physical evidence of Ulloa present at the scene prior to the incident and Roberto's wound to his leg as a result of being shot. When Villasenor was arrested at a gas station later that day, he had in his possession a black baseball cap with "Arvin" on it, two cell phones, a live .40-caliber bullet, and a loaded .40-caliber pistol.

Nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges. "The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.) Gang evidence, " 'including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear,

---

[12]     The record indicates that Roberto's brother Juan, the third victim, was in Mexico and unavailable as a witness at trial.

17.

or other issues pertinent to guilt of the charged crime.' " (*Ibid.*, quoting *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)  Additionally, "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and ....  An explanation of the basis for the witness's fear is likewise relevant to her credibility ...." (*People v. Burgener* (2003) 29 Cal.4th 833, 869.)

"But, 'even where gang membership is relevant, because it may have a highly inflammatory impact on the jury[,] trial courts should carefully scrutinize such evidence before admitting it.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 294.)  "Such evidence should not be admitted if only tangentially relevant" (*People v. Gurule* (2002) 28 Cal.4th 557, 653), or "where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449; accord, *People v. Cardenas* (1982) 31 Cal.3d 897, 904-905).  "Erroneous admission of gang-related evidence, particularly regarding criminal activities, has frequently been found to be reversible error, because of its inflammatory nature and tendency to imply criminal disposition, or actual culpability." (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.)

Here, at least some gang evidence would have been admissible to prove the underlying charges even if the gang allegations had been bifurcated and severed.  Luis referred to his attackers as gang members when he spoke to law enforcement.  Mosqueda had definite visible gang tattoos on his face, and Villasenor, Ulloa and Mosqueda were working in concert.  As testified to by the gang expert, the more visible the gang tattoos, the more fear is instilled in the community by their actions.  At trial, Luis testified that he was nervous and felt "panic" in looking at the two defendants, and he had "anxiety attacks because of what happened" and did "not live the same way anymore."

Thus, even if section 1109 required bifurcation of the gang enhancements and substantive gang offense allegations, it is likely some, though not all, of the gang

evidence would have come in at a trial on the other substantive offenses. (See *People v. Hernandez, supra,* 33 Cal.4th at pp. 1049-1050 ["To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 ["evidence related to gang membership is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative"].)

We further note the jury was given a limiting instruction regarding its consideration of the gang evidence, both before closing arguments and after, which we presume it followed. (See *People v. Franklin* (2016) 248 Cal.App.4th 938, 953 ["We presume that the jury followed these limiting instructions [regarding considering gang evidence for limited purpose], and there is nothing in this record to rebut that presumption"].) Consequently, on this record, we cannot conclude Ulloa was prejudiced by the failure to bifurcate the substantive gang offense and gang enhancement allegations from the other charges. (See *People v. Hernandez, supra,* 33 Cal.4th at p. 1051 ["Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt"].) Thus, Ulloa is not entitled to reversal and retrial of his remaining convictions on this basis.

Finally, we note that the jury's verdict, which acquitted Ulloa of the premeditated attempted murder charge, all of the false imprisonment charges, and two of the three assault with a deadly weapon charges, demonstrates that it was not improperly affected by the admission of the gang evidence. Instead, the verdict demonstrates that the jury considered each piece of evidence separately, and it was not swayed by any prejudice that might have flowed from the gang evidence. (*People v. Ramos, supra,* 77 Cal.App.5th at pp. 1131-1132; *People v. Williams* (2009) 170 Cal.App.4th 587, 613.)

19.

In sum, we find that it is not reasonably probable Ulloa would have received a more favorable result if the gang allegations had been severed and bifurcated, and therefore any error was harmless. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

Because we find harmless error in failing to bifurcate and sever the gang allegations, we also find no error in the trial court's denial of Ulloa's motion for new trial based on the same grounds. (*People v. Bean* (1988) 46 Cal.3d 919, 940.)

## II. PROSECUTORIAL MISCONDUCT/INEFFECTIVE ASSISTANCE OF COUNSEL

Ulloa also argued that the prosecutor engaged in deception, which caused the trial court to improperly deny the motion to sever and bifurcate the gang allegations. Ulloa contends that, if we find the issue of prosecutorial misconduct has been waived, defense counsel was ineffective for failing to object to the prosecutor's alleged misstatement.

*Background*

At the preliminary hearing, Jose C., the owner of the corrals where the incident took place, testified that he first noticed "something unusual" on the evening of July 26, 2018, when he saw a truck belonging to Villasenor leave the corral. The truck was being driven by Ulloa, whom Jose C. knew as "little Casper," because that was what "[e]verybody in Arvin" called him. Jose C. had known Ulloa since he was a child.

Prior to trial, as addressed in part I., *ante*, Ulloa made a motion in limine asking that the gang allegations and evidence be severed or bifurcated. At the hearing on the motion to bifurcate, the prosecutor explained that, while she was not aware of anything said or any gang signs displayed at the time of the incident about Arvina 13, Mosqueda had visible gang-related tattoos "plastered on his face and his head", which would have been apparent to the victims. Ulloa's counsel countered that neither Ulloa nor Villasenor had any visible tattoos, none of the victims knew Mosqueda's tattoos to be gang-related, none of them had any idea whether the crime was committed by gang members, and there

20.

was no other evidence to indicate to the victims that the perpetrators were gang members. Villasenor's counsel joined in these comments.

The prosecutor then cited page 215 of the preliminary hearing transcript and referred to testimony "of a victim" who knew Ulloa was known as "Lil Casper," his gang moniker. The prosecutor reasoned that "these victims know who these individuals are, they know what their monikers are" and, because the victims were aware the perpetrators were gang members, bifurcation was not appropriate. The prosecutor argued against bifurcation, reasoning that, "Based on the fact that at least one victim knows of Mr. Ulloa's moniker does show that they are aware that these people may be gang members and goes to the fear and whether or not they fight back or not."

Ulloa's counsel repeated that the evidence showed the victims "said they had no idea who [Ulloa] was." Villasenor's counsel also noted that the page in the preliminary hearing transcript cited by the prosecutor did not reference Ulloa being a gang member or demonstrate any knowledge that he was a gang member, only that Ulloa had a moniker.

The trial court reviewed and recited the relevant pages of the preliminary hearing transcript and then discussed relevant case law and legal concepts applicable to a bifurcation motion. In denying the motion to bifurcate, the trial court found that gang evidence, generally speaking, was relevant, admissible, and, "at this point," was not more prejudicial than probative.

*Applicable Law and Analysis*

Ulloa alleges the prosecutor's labeling of Jose C. as a "victim" and his knowledge of Ulloa's gang moniker as evidence that the victims knew the perpetrators were gang members was intentionally deceptive. The People argue Ulloa failed to object to the prosecutor's designation of Jose C. as a victim and thereby forfeited the claim. To the extent this claim is forfeited, Ulloa claims he received ineffective assistance of counsel.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a

21.

denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; see *People v. Mendoza* (2007) 42 Cal.4th 686, 700.) "The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor." (*Mendoza, supra*, at p. 700.) " 'A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

As a threshold matter, Ulloa acknowledges that a defendant may not complain on appeal of prosecutorial misconduct unless he objected on the same ground and timely requested an adequate remedy. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) However, he argues that, to the extent his claim regarding prosecutorial misconduct is forfeited, his counsel provided ineffective assistance in failing to object. " 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674; see *People v. Lopez* (2008) 42 Cal.4th 960, 966.)

A criminal defendant has a Sixth Amendment right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) To prove ineffective assistance of counsel, a defendant must satisfy *Strickland's* two-part test requiring a showing of counsel's deficient performance and prejudice. (*Ibid.*) A defendant bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice. (*Id.* at

pp. 688, 694; *People v. Centeno, supra,* 60 Cal.4th at p. 674; *People v. Ledesma* (2006) 39 Cal.4th 641, 746.)

As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Strickland v. Washington, supra,* 466 U.S. at p. 688.) "Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*People v. Ledesma, supra,* 39 Cal.4th at p. 746.) A "mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*People v. Ghent* (1987) 43 Cal.3d 739, 772; see *People v. Centeno, supra,* 60 Cal.4th at pp. 674-675.)

The prejudice prong requires a defendant to establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington, supra,* 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*) Prejudice must be affirmatively proved. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Where a defendant fails to show prejudice, a reviewing court may reject a claim of ineffective assistance of counsel without reaching the issue of deficient performance. (See *Strickland*, at p. 697.)

Here, the record reflects that Ulloa's counsel addressed the inaccuracy of the prosecutor's comment and highlighted the evidence that the victims "had no idea who Ulloa was." Villasenor's counsel then further noted to the court that the statement

23.

referenced by the prosecutor did not establish Ulloa was a gang member, only that he was referred to by his moniker.

It is important to note that the remarks were not made to the jury but to the trial court, which was aware and specifically reviewed the preliminary hearing testimony. Ulloa's counsel could have reasonably determined that the trial court was not misled by the prosecutor's statement – perhaps the trial court was not so focused on Jose C. as being a "victim" (as the preliminary hearing transcript was clear that Jose C. was not present at the time of the shooting), but rather on Jose C.'s comment that "[e]verybody in Arvin" called Ulloa by his moniker, meaning his gang membership was well known.

Even if Ulloa's counsel should have objected further, we find Ulloa was not prejudiced by this failure. Ulloa incorrectly focuses his prejudice analysis on whether it is reasonably probable he would have received a different verdict at trial. But the appropriate analysis is whether it is reasonably probable he would have received a more favorable outcome on the trial court's bifurcation ruling.

To the extent Ulloa reiterates arguments that were made to support his bifurcation claim, we have addressed that issue in part I., *ante*, and affirm our decision.

We therefore reject Ulloa's claim of ineffective assistance of counsel.

III.     SUFFICIENT EVIDENCE OF SUBSTANTIVE GANG OFFENSE

Ulloa next contends there was insufficient evidence to support the gang participation allegation, section 186.22, subdivision (a), as there was no substantial proof

24.

that Ulloa acted with knowledge of the pattern of criminal activity of the Arvina 13 gang, "specifically the asserted predicate offenses." We disagree.[13]

*Standard of Review*

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.)

" ' "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. " ' " (*People v. Smith, supra,* 37 Cal.4th at p. 739.)

"In cases in which the People rely primarily on circumstantial evidence, the standard of review is the same. [Citations.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the

---

**13** Although we agree with the People's concession that the ameliorative changes wrought by Assembly Bill 333 require we reverse the true findings on the gang enhancements and gang substantive offense (see part I., *ante*), and allow the prosecution to retry Ulloa under the Assembly Bill 333's new requirements, we address Ulloa's contention here because a successful challenge on sufficiency of the evidence would bar retrial (*People v. Sek* (2022) 74 Cal.App.5th 657, 669-670 [noting that double jeopardy clause would bar retrial if evidence is deemed insufficient under statute as it read at the time of trial, but not where prosecution failed to prove elements under statute amended after trial].)

appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]' [Citation.] ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' " (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

*Applicable Law and Analysis*

We address Ulloa's contention based on the law as it stood at the time of trial. Section 186.22, subdivision (a) provides, in relevant part, as follows: "A person who actively participates in a criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in felonious criminal conduct by members of that gang, shall be punished ...."

For a violation of section 186.22, subdivision (a), the prosecutor must prove: (1) active, not merely nominal or passive, participation in a criminal street gang; (2) knowledge of the gang's members current or past engagement in a pattern of criminal street gang activity; and (3) willful promotion, furtherance, or assistance in felonious conduct by the gang members. (*People v. Lamas* (2007) 42 Cal.4th 516, 523.) The third element of section 186.22, subdivision (a) requires that at least two members of the gang commit felonious criminal conduct; a defendant acting alone does not suffice. (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1128-1130, 1138-1139.)

Ulloa contends there was insufficient evidence of his knowledge that he knew that the Arvina 13 gang engaged in a pattern of criminal gang activity, specifically the asserted predicate offenses. (§ 186.22, subd. (a); see *People v. Rodriguez, supra,* 55 Cal.4th at p. 1130 [describing the second element of the offense as "knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity"].)

First, there is no statutory requirement, as Ulloa suggests, that he have knowledge of the same predicate offenses relied upon by the prosecution to establish a pattern of criminal gang activity to show the Arvina 13 organization qualifies as a criminal street gang under section 186.22, subdivision (f), or that his knowledge be of crimes committed by "other gang members" as opposed to his own. Instead, the plain language of section 186.22, subdivision (a) indicates that a defendant's knowledge of any two qualifying predicate crimes will suffice ("a pattern of criminal gang activity"). Thus, while a defendant's knowledge of the predicate offense relied upon by the People would meet the requirement, the knowledge element may be satisfied by evidence that Ulloa knew gang members engaged in any two, or more, qualifying offenses. Here, Ulloa tacitly acknowledges he was aware of the two offenses he personally was accused of committing—a burglary when he was 15 years old with another teen he believed to be a gang member, and a subsequent possession of a loaded firearm—both qualifying offenses to establish a pattern of criminal activity.

There was also circumstantial evidence to show that Ulloa was aware that gang members engage in, or have engaged in, a pattern of criminal gang activity. While he may claim lack of knowledge of the specific predicate offenses Officer Calderon testified to, Ulloa had been an Arvina gang member since before February 5, 2015, when he committed the burglary with Rodriguez. And it should be noted that Rodriguez was the same person Villasenor communicated with about the assault committed at Alshaif Market in September 2014. Officer Calderon testified that Arvina gang members "commonly communicate with each other regarding crimes they commit as a way to brag about the crimes they've committed." And, in Officer Calderon's experience, Arvina gang members are aware of at least some, if not all, of the continuing pattern of criminal conduct that is occurring.

Based on the evidence in the record, we reasonably infer Ulloa had knowledge that Arvina gang members engage in, or had engaged in, a pattern of criminal gang activity,

and we reject his claim of insufficient evidence to sustain his section 186.22, subdivision (a) gang participation substantive offense conviction.

IV.    SUFFICIENCY OF THE EVIDENCE ON GANG ENHANCEMENTS

Ulloa also contends there was insufficient evidence to support the gang-related enhancements.  Specifically, he argues that, under the law as it existed at the time of the trial, there was insufficient evidence he committed any crime for the benefit of, at the direction of, or in association with a criminal street gang, and/or with the specific intent to promote, further, or assist in criminal conduct by gang members.  We disagree.[14]

Again, "The standard of appellate review for determining the sufficiency of the evidence supporting an enhancement is the same as that applied to a conviction." (*People v. Weddington* (2016) 246 Cal.App.4th 468, 483 (*Weddington*).)

To establish the gang enhancement under section 186.22, subdivision (b), the prosecution must establish "that the underlying felonies (1) were committed for the benefit of, at the direction of, or in association with any criminal street gang and (2) were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*People v. Roberts* (2017) 13 Cal.App.5th 565, 572.)

"Because the first prong is worded in the disjunctive, a gang enhancement may be imposed without evidence of any benefit to the gang so long as the crime was committed in association with or at the direction of another gang member." (*Weddington, supra,* 246 Cal.App.4th at p. 484.)  Here, respondent agrees that the evidence did not prove Ulloa committed the charged offenses at the direction of the gang, the evidence was sufficient to support a finding that he committed them for the benefit of and in association with the gang.

The second prong applies to any criminal conduct and can include the conduct underlying the charged offense. (*People v. Albillar* (2010) 51 Cal.4th 47, 66 (*Albillar*)

---

[14]    See footnote 13.

28.

[" 'There is no statutory requirement that this "criminal conduct by gang members" be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing' "]; see also *People v. Vasquez* (2009) 178 Cal.App.4th 347, 354.) Because intent is rarely susceptible of direct proof, it must be inferred from the surrounding facts and circumstances. (*People v. Kopp* (2019) 38 Cal.App.5th 47, 72.) "For this reason, 'we routinely draw inferences about intent from the predictable results of action.' " (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411.)

Proof of association with a gang may be established with substantial evidence that two or more gang members committed the crime together, unless there is evidence that they were on a frolic and detour unrelated to the gang. (*Weddington, supra,* 246 Cal.App.4th at p. 484.) In the instant matter, the prosecution presented substantial evidence that Villasenor, Ulloa, and Mosqueda were all members of the Arvina gang. Both Villasenor and Mosqueda had gang tattoos; Mosqueda had multiple gang tattoos on his head, and the incident took place in gang territory. In fact, Ulloa summoned Mosqueda to "help" assault the victims. (*Albillar, supra,* 51 Cal.4th at p. 62 [evidence that defendants came together as gang members to commit crimes constituted substantial evidence the crimes were committed in association with a gang].) Under these circumstances, Villasenor, Ulloa and Mosqueda "not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes." (*Id.* at pp. 61-62.) Accordingly, there was more than sufficient evidence to satisfy the "in association" requirement of the first statutory prong. (*Id.* at p. 62; see also *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 ["the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members"].)

The California Supreme Court further concluded in *Albillar, supra,* 51 Cal.4th 47, that, "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id.* at p. 68.) Accordingly, the evidence outlined above also satisfies the jury's finding that the second prong of section 186.22, subdivision (b)(1) was satisfied. (*Ibid.*; see also *People v. Miranda, supra,* 192 Cal.App.4th at p. 412 [substantial evidence supported finding of specific intent to benefit gang where defendant gang member committed crimes with two other members or associates of the gang in gang territory]; cf. *People v. Franklin, supra,* 248 Cal.App.4th at p. 949 [noting "scienter requirement may be satisfied with proof 'that the defendant intended to and did commit the charged felony with known members of a gang,' " but concluding intent requirement not met where defendant committed crimes with members of a different gang].)

We thus conclude sufficient evidence supported the gang-related enhancement under section 186.22, subdivision (b) under the law as it existed at the time of trial.

V.     ENACTMENTS TO SECTION 1170 REQUIRE REMAND

Ulloa next claims that his case must be remanded to the trial court for resentencing under amended section 1170, subdivision (b)(6). The People concede the issue, and we remand for resentencing.

*Background*

As relevant here, Ulloa was sentenced to the upper terms on counts 1, 2, and 8, and the middle term on the firearm enhancement attached to count 1, and the upper term on the firearm enhancement attached to count 2.

*Applicable Law and Analysis*

Effective January 1, 2022, our determinate sentencing law, section 1170, was amended in several fundamental ways. (See Sen. Bill No. 567 (2020–2021 Reg. Sess.);

30.

Stats. 2021, ch. 731, § 1.3; Assem. Bill No. 124 (2020–2021 Reg. Sess.); Stats. 2021, ch. 695, § 5.)  Relevant here, Senate Bill No. 567 amended section 1170, former subdivision (b) by making the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist.  (Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (2).)  This bill also created a presumption in favor of a low prison term when a defendant is under 26 years of age at the time of the offense. (Stats. 2021, ch. 695, § 4, adding § 1016.7; Stats. 2021, ch. 695, § 5.1, adding § 1170, subd. (b)(6)(B).)

Section 1170, subdivision (b)(6) provides: "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] ... [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense."  (§ 1170, subd. (b)(6); see § 1016.7, subd. (b) ["A 'youth' for purposes of this section  includes any person under 26 years of age on the date the offense was committed"].)

Section 1170, subdivision (b)(6)(B) does not require imposition of the lower term in every case in which the defendant was under age 26 at the time the crime was committed.  Rather, this provision establishes a presumption of the lower term if the defendant's youth was "a contributing factor" in his or her commission of the crime "*unless* the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice."  (§ 1170, subd. (b)(6).)

The People correctly concede the amended version of section 1170, subdivision (b) that became effective on January 1, 2022, applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal.  (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308.)  Under established law, we "assume, absent evidence to the contrary, that the Legislature intended an 'amended statute to

apply to all defendants whose judgments are not yet final on the statute's operative date.' " (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341.) "For the purpose of determining the retroactive application of an amendment to a criminal statute, the finality of a judgment is extended until the time has passed for petitioning for a writ of certiorari in the United States Supreme Court." (*Id.* at pp. 341-342, citing *People v. Vieira* (2005) 35 Cal.4th 264, 305-306.)

Ulloa was 19 years old at the time he committed the offenses in July of 2018. Because the trial court imposed the upper term on counts 1, 2 and 8, and the middle term on the enhancement attached to count 1 and upper term on the enhancement attached to count 2,[15] we agree with the parties that under section 1170, subdivision (b), Ulloa's sentence must be vacated and remanded to the trial court to decide under the newly amended law whether he is entitled to the lower term on any or all of those counts.

## VI.    *MIRANDA* VIOLATION

Ulloa joins Villasenor's argument that the trial court erroneously admitted statements Villasenor made during the investigation of a 2014 assault at Alshaif Market in violation of *Miranda.* As argued by Villasenor in his opening brief, the 2014 incident at the Alshaif Market was "crucial" to the prosecution's case, as it was the only prior instance of Villasenor spending time with gang members or engaging in behavior that might have been gang-related, and Villasenor's involvement in that incident was erroneously established by his own statements. Villasenor's claim is twofold: first, that his statement made to an officer at school about getting a tattoo the night before the 2014 incident was made in response to law enforcement questioning and should have been excluded; and second, he claims his statements from a subsequent interview at the police

---

[15]    As addressed in part I., *ante*, the gang enhancements attached to count 1 and 2, as well as the gang offense in count 8 are reversed.

department should have been excluded because he had unambiguously invoked his right to counsel.

Ulloa's contention is that his due process rights suffered as a result of the admission of the statements made by Villasenor. Ulloa acknowledges that he "lacks standing to directly contest a violation of Villasenor's *Miranda* rights," but contends, absent those statements, the jury "could easily have concluded Ulloa's motivation for the shooting following the altercation at the corrals was a personal matter," and not gang-related.

We find no merit to his claim.

## Relevant Background

Prior to trial, Ulloa filed motions in limine to exclude any reference to or evidence of his or Villasenor's alleged pretrial statements under *Miranda*, specifically defense motions in limine No. 6 and No. 13. Villasenor joined Ulloa's motions in limine.

In addressing motion No. 6, as to the *Miranda* issue, the trial court found the issue moot as to Ulloa, and stated an Evidence Code section 402 hearing would be held as to "the juvenile incident," meaning the 2014 incident involving Villasenor. The trial court also found motion No. 13 moot.

Multiple officers testified pursuant to Evidence Code section 402 for various in limine purposes. The following recites the testimony relevant to the 2014 incident involving Villasenor.

## Evidence Code Section 402 Hearing

As noted previously, on September 3, 2014, when Villasenor was 17 years old, he engaged in a fight at the Alshaif Market. Officer Calderon testified that he was not present for Villasenor's interview with law enforcement involving the September 3, 2014 incident. Following Officer Calderon's testimony, the trial court explained that additional foundation testimony would be required before evidence concerning Villasenor's statements involving the September 3, 2014, incident would be admitted.

Sergeant Patricia Stewart testified at the Evidence Code section 402 hearing that, on the morning after the incident, she and Officer Jose Vasquez went to Arvin High School and contacted Villasenor near the dean's office to question him about the previous day's assault. According to Sergeant Stewart, Villasenor was not under arrest at that time, nor was he detained, but she did not tell him he was free to leave if he wished. Villasenor was not told to sit in any particular place or stay in the office where they were. She did not read him his *Miranda* rights.

During their conversation, Sergeant Stewart noticed that Villasenor's hand looked bruised and that he had a tattoo on it, but she did not ask him about it. Villasenor said it was "ink from the tattoo that he had just gotten the evening prior." Sergeant Stewart subsequently asked Villasenor to accompany her to the police department, which he did.

As to the exchange at the high school, the trial court ruled that Villasenor had been subject to a custodial interrogation and was not free to go. However, the trial court ruled that Villasenor's statement about getting a tattoo the night before was admissible because Villasenor was not asked any questions about the tattoo. Instead, the trial court ruled that "it was something [Villasenor] said without being asked."

Officer Vasquez testified that he and Sergeant Stewart interviewed Villasenor at the police station on September 4, 2014. Before questioning Villasenor, Officer Vasquez read Villasenor his *Miranda* warnings verbatim from a department form. When asked, Villasenor indicated that he understood his rights. Before questioning began, Villasenor stated that he wanted his attorney or his mother present, after which questioning stopped. Once Villasenor's mother was present, Villasenor was again asked if he would like to speak to the officers and he said he would. Villasenor then admitted that he was present at the Alshaif Market on September 3, 2014, to cash a check. A friend had driven him there. Once he had cashed the check, Villasenor stepped outside and "a friend," whom Villasenor would not identify but was later identified as Joe Martinez, started fighting with another man.

Later in the interview, Sergeant Stewart asked Villasenor about his tattoo, and he stated he "woke" up with it on the morning of September 4, 2014. When asked about the meaning of the tattoo, Officer Vasquez reviewed his report and stated that the tattoo was the letter "A" and Villasenor claimed he did not know what it was and that he was not involved in any gang. Villasenor did acknowledge that the letter "A" was normally used by the Arvina gang. When asked, Villasenor admitted that he joined in the fight at the market.

On cross-examination, Villasenor's counsel questioned Officer Vasquez about his police report of the interview. After refreshing his memory, Officer Vasquez acknowledged that, in his report, after being *Mirandized*, Villasenor had said, "I ain't going to answer anything until my attorney is here." Officer Vasquez had then asked, "So you're refusing to talk," and Villasenor had then said, "yeah, unless my mom is here or my attorney I'll speak."

On redirect, Officer Vasquez testified that, once Villasenor's mother was present, he again asked Villasenor if he "still want[ed] to talk about the case." Once Villasenor's mother was present, the interview was audio recorded.

At the Evidence Code section 402 hearing, Sergeant William Funderburk testified that he was provided a cell phone on September 4, 2014, belonging to Villasenor. According to Sergeant Funderburk, Villasenor had been earlier *Mirandized*, although Sergeant Funderburk was not present at the time. Sergeant Funderburk spoke to Villasenor when he was already arrested and booked and asked if he could search his cell phone. Villasenor said he could and signed a consent form. Sergeant Funderburk located text conversations made September 3, 2014, between Villasenor and Juan Martinez in which Villasenor bragged about jumping and stabbing "some fool" at the camel store. In the text messages, Villasenor said he got an "A" tattoo that he "put in [the] work" in for.

Following testimony, the trial court listened to the relevant portions of the recorded interview and found that the interview with Villasenor had been "a

35.

conversational discussion," and while Villasenor was not free to leave, he was not "badgered or threatened." The trial court described Villasenor as first wanting an attorney and then clarifying that he wanted either an attorney or his mother. At this point, the interview was terminated until his mother was located. At that point, the interviewer asked Villasenor if he wanted to proceed because his mother was now present. Villasenor said he would. As summarized by the trial court in finding that Villasenor had waived his *Miranda* rights:

> "It's about an hour and a half gap, but it's clear he was reminded of his rights and he was specifically asked. It wasn't, well, here's your mom, let's get going. He was asked. It was reiterated. You said before you wanted an attorney or your mom. Your mom is here. Do you want to talk now?"

*Trial Evidence*

At trial, Sergeant Stewart testified that, on September 4, 2014, she contacted Villasenor at school, where he told her he had gotten a tattoo on his hand the night before.

Sergeant Stewart and Officer Vasquez subsequently conducted an interview of Villasenor at the police station. Villasenor's mother was present and he waived his *Miranda* rights. During the interview, Villasenor stated that he had gone to the market to cash a check, and saw one of his friends get into a fight with someone with an "LA" tattoo. Villasenor joined in the fight. Villasenor also explained that he got an "A" tattoo on his hand later that night, and he admitted the tattoo represented the Arvina gang, but claimed he was not affiliated with any gang. Villasenor also described the clothing he was wearing at the time, which matched the clothing of one of the perpetrators as shown on a surveillance video.

Cell phone evidence showed that Villasenor bragged to another gang member about committing the crime. Villasenor texted "Lil Wyno" that "we jumped him" during the September 3, 2014, assault. When asked by Juan Martinez in another text "who let you do the A?", referring to Villasenor's new tattoo, Villasenor replied he "put in work

36.

and Posadas did them for me." According to the text, Villasenor "rushed with Jay and Shadow" at the market to "pop the fool from LA." Officer Calderon believed that Villasenor was allowed to get the tattoo as a reward for the assault.

*Standard of Review and Applicable Law*

Although a defendant cannot object to the violation of another's right to self-incrimination, "a defendant does have limited standing to assert that his own due process right to a fair trial has been violated through the admission of improperly obtained statements made by a third party." (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1016.) To prevail on such a claim, the defendant must establish that the evidence produced at trial was made unreliable, due to coercion or the involuntary nature of the third party's statements, and therefore rendered his own trial fundamentally unfair. (*People v. Williams* (2010) 49 Cal.4th 405, 452-453.)

Ulloa cites *People v. Williams, supra,* 49 Cal.4th 405 in asserting that the admission of Villasenor's 2014 statements "arguably violated [his] due process right to a fair trial in [the] context of gang allegations." However, Ulloa does not independently assert or attempt to establish that Villasenor's prior statements were erroneously admitted, instead relying on Villasenor's briefing to establish it. "Independent of whether a defendant's rights under *Miranda* were observed, his or her statements may not be admitted unless they were voluntary. 'The court in making a voluntariness determination "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." ' " (*People v. Krebs* (2019) 8 Cal.5th 265, 299.) Villasenor's briefing, however, argued that his statements were made in violation of his *Miranda* rights, not that his statements were coerced and involuntary.

While joinder is broadly permitted, "each appellant has the burden of demonstrating error and prejudice [citations]." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364, quoting *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.) However, "neither the Attorney General nor this court is required to divine" a

37.

theoretical argument as to how the statement were coerced or involuntary." (*Bryant, supra,* at p. 363.) For that reason, Ulloa's attempt to rely on Villasenor's arguments and reasoning to establish that the statement were coerced or involuntarily made "is insufficient to satisfy his burden on appeal." (*Nero, supra,* at p. 510, fn. 11.) We therefore find Ulloa's claim forfeited and deny his claim of joinder on this point.

## VII. MOTION FOR MISTRIAL

Ulloa also joins in Villasenor's argument that the trial court erred when it denied Villasenor's mistrial motion after a police officer, in violation of a court ruling, informed the jury that the victim in the 2014 Alshaif Market incident was stabbed multiple times. We find no merit to his claim.

### *Background*

Prior to Officer Jeffrey Packebush's testimony, the trial court and the parties held a sidebar to discuss the prosecution's desire to ask the officer questions about the injuries he observed to the victim of the September 4, 2014, assault as Alshaif Market. The parties agreed that Officer Packebush could indicate the victim suffered lacerations, but he could not specifically mention "stab wounds," because there was no evidence Villasenor stabbed anyone with a knife. The prosecution informed Officer Packebush of the trial court's ruling.

During Officer Packebush's testimony, the prosecutor asked him what he personally observed about the victim. Officer Packebush answered, "That he was injured. He was holding a blood-soaked paper towel to his forehead." When the prosecutor asked Officer Packebush what injuries he noticed, the officer replied, "They appeared to be multiple laceration stab wounds."

Villasenor's counsel objected. The trial court overruled the objection, but admonished the jury that the testimony should be considered in conjunction with other testimony it would hear later that day or the next, and then clarified, "Any stab wounds or

puncture wounds that is being testified to by this officer were not inflicted by either of these defendants."

Officer Packebush continued his testimony, stating that he observed a vertical laceration on the bridge of the victim's nose, injuries to the victim's arms, his left shoulder, and his back, and observed blood outside the front of the store.

At the next court recess, the trial court addressed the objection that had been made. The trial court acknowledged that Officer Packebush had violated its ruling, but that he did not do so intentionally, and that was why the trial court chose to simply tell the jury that any stabbing or puncture injuries were not inflicted by either Villasenor or Ulloa.

Villasenor's counsel moved for mistrial as the testimony was "highly inflammatory and prejudicial" to Villasenor. Counsel argued that the jury would consider that the victim had been stabbed in a fight Villasenor had been involved in. Ulloa's counsel joined in the motion for mistrial, on grounds that the evidence had violated the trial court's ruling as well as Evidence Code section 352.

The prosecutor stated he specifically told Officer Packebush "not to say the word stab or stab wounds in any way and just to describe the injuries that he saw." The prosecutor also noted that the co-perpetrator of the 2014 incident, Joe Martinez, was convicted of assault with a deadly weapon as a result of that incident, which was being offered as a predicate offense to prove the gang allegation. The prosecutor further argued that the testimony about the stabbing was not unduly inflammatory, and that the trial court cured the prejudicial impact by admonishing that neither Villasenor nor Ulloa engaged in that conduct.

The trial court denied the motion for mistrial, agreeing with the defense that "jurors don't unhear things," but that jurors were presumed to follow the trial court's instructions. The trial court then precluded the prosecution from admitting the video of the incident into evidence, although the defense could do so if it wished.

When the jury returned, the trial court again instructed the jury as follows:

39.

"I'm going to read to you an admonition. This means you must consider what I'm telling you. There's another jury instruction that I read at the end of the case that is something like it's up to you to decide what the evidence is. [¶] I'm not the judge of the facts. Do not consider any comments I have made in regard to what I may think about the case. That's absolutely true. I'm not telling you what to think about the case, but I'm telling you this and you must consider this along with all the rest of the other evidence and the jury instructions a[t] the end and the ones I read at the beginning. [¶] In regard to the incident outside the entrance to the Alshaif Market in 2014 that you just heard about, Mr. Daniel Ulloa was not present and had zero involvement. You have heard from another witness later on in this trial that Mr. Ricardo Villasenor was present; however, Mr. Villasenor did not possess any knife or weapon on that date and did not stab anyone."

*Applicable Law and Analysis*

The trial court should grant a mistrial " ' "if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.] A motion for a mistrial should be granted when " ' "a [defendant's] chances of receiving a fair trial have been irreparably damaged." ' " ' [Citation.] " (*People v. Edwards* (2013) 57 Cal.4th 658, 703.)

"A witness's volunteered statement can, under some circumstances, provide the basis for a finding of incurable prejudice." (*People v. Ledesma, supra,* 39 Cal.4th 641, 683.) However, the improper subject matter will rarely be " 'of such a character that its effect ... cannot be removed by the court's admonitions.' " (*People v. Allen* (1978) 77 Cal.App.3d 924, 935.) Deciding "whether the error can be cured by striking the testimony and admonishing the jury rests in the sound discretion of the trial court." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581.) Reversal is required only if it is reasonably probable that the volunteered comments could have affected the outcome of the trial. (*Ibid.*)

40.

Villasenor relied on *People v. Turner* (2021) 73 Cal.App.5th 1167, to support his argument of prejudice. In that case, two murders were initially joined for trial before the trial court severed the second murder, struck the evidence related to it as inadmissible, instructed the jury not to consider it in its deliberations on the first murder, and denied a motion for mistrial. (*Id.* at pp. 123-124.) Evidence of the second murder had encompassed approximately 15 percent of the testimony at trial, and included extensive and graphic details about the second murder. (*Id.* at pp. 124, 129-130.) The Court of Appeal found an abuse of discretion in denying the mistrial because evidence of the second murder had been extensive; malice was a contested issue at trial; defendant's defense was that he committed only voluntary manslaughter, and evidence of the second murder would have irreparably damaged his credibility; and the jury was not admonished to not to consider it until a week after hearing the evidence. (*Id.* at pp. 129-130.)

Here, only one instance of improper testimony occurred. The trial court immediately admonished the jury to consider the evidence in conjunction with other testimony it would hear later at trial, and then clarified that neither Villasenor nor Ulloa had inflicted the stab wounds Officer Packebush testified to. The trial court repeated this instruction immediately after it denied Villasenor's motion for mistrial.

We must presume that the jury followed those instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) "Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured." (*People v. Martin* (1983) 150 Cal.App.3d 148, 163; see also *People v. Seiterle* (1963) 59 Cal.2d 703, 710 [it is only in "exceptional cases" where "the improper subject matter is of such a character that its effect on the minds of the jurors cannot be removed by the court's admonitions"].) Here, nothing suggests the jury failed to follow the trial court's admonitions and instructions.

Furthermore, as with Villasenor, it is unlikely Ulloa would have realized a more favorable result had the jury not heard reference to the 2014 incident victim's stab wounds. The fact that the victim in the September 2014 incident had been stabbed was not more inflammatory in comparison to the circumstances in the charged offense. Evidence at trial was that, when Ulloa started a fight with Luis, Villasenor jumped in and repeatedly hit Roberto; Villasenor held a gun in order to keep the victims in the corral until Ulloa returned with Mosqueda; and when Ulloa returned, Villasenor continued to display his gun to keep Luis and the other from interfering when Luis attacked and then shot Roberto in the leg. We also note that the verdict in this case demonstrates that Ulloa did not suffer prejudice, as he was acquitted of several offenses and found guilty of the lesser included offenses as to others.

We conclude the record "demonstrates the absence of any incurable prejudice of the sort that would require the granting of a motion for mistrial." (*People v. Jenkins* (2000) 22 Cal.4th 900, 986.) The trial court could reasonably conclude that the references to the 2014 victim's stab wounds would not irreparably damage Villasenor's chances of receiving a fair trial, nor Ulloa's, and it did not abuse its discretion by denying the mistrial motion.

VIII.  VICTIMS PRECLUDED FROM CROSS-EXAMINATION ABOUT IMMIGRATION STATUS

Ulloa also joins in Villasenor's claim that the trial court improperly precluded cross-examining the victims about their awareness of possible immigration relief, ostensibly through the U visa program which generally provides temporary immigration benefits to victims of specified crimes if a law enforcement agency certifies the victim was helpful in the prosecution of the crime. (8. U.S.C. § 1101 et seq.; see *Lee v. Holder* (9th Cir. 2010) 599 F.3d 973, 974 [discussing general qualifications for and benefits of U visas].) We find no abuse of discretion in excluding the issue from cross-examination. Even if the exclusion was error, it was harmless under the circumstances of this case.

42.

*Background*

On cross-examination of Luis, Ulloa's counsel asked Luis if he was in the United States on a work visa. The prosecutor objected on grounds of relevance, which was sustained. Ulloa's counsel stated the evidence was relevant to bias and credibility, and a sidebar held.

Outside the jury's presence, Ulloa's counsel argued that Luis might have been involved in cockfighting, a felony that would potentially impact his ability to remain in the United States, if he were here illegally, and that his involvement could have led him to be deceptive about the case. Villasenor's counsel added that she had received information that Roberto had applied for either legal residency or some form of "victim of a crime" residency as a result of his involvement in the case, and she requested the prosecutor investigate further.

The trial court explained that, at the time the question was posed, it had not believed there was a basis to ask it, "particularly in light of current law." But it did permit an investigating officer to ask Luis, off the record, if he was a United States citizen or on a work visa. Luis declined to answer any of the officer's questions. As a result, the trial court tentatively ruled there would be no questions asked of Luis "as to his status in this country, whether he's a citizen, whether he's on a work VISA, whether it's something different." However, the trial court did allow the parties to brief the issue.

The following week, the trial court revisited the issue and ruled that the fact that someone may not be a legal resident, on its own, was not admissible under Evidence Code sections 351.4 and 352. But, it held that, if there was some benefit provided to the witness by the government, discovery of that benefit would be provided to the defense and the trial court would reconsider its ruling.

The following day, the prosecutor sent an e-mail to the court and parties stating that Roberto was aware of the possibility that a "status benefit" might arise based on his being a victim, but he claimed he had not formally inquired about it or followed through

43.

with anything.  According to the prosecutor, the police department denied Roberto's request for a copy of the police report in the case, but it had not received any immigration status requests from him.  The prosecutor believed Luis was aware at that time of the visa procedure, as likely brought to his attention by the victim advocate, but he had not filed an application for it.

The trial court then held an in-camera hearing with Luis, who denied being offered any money or a visa by any government agency in connection with this case.  He also denied having applied for a visa or for residency in the United States as a victim of a crime.

The trial court also held an in-camera hearing with Roberto, who denied being offered any money or compensation by the government for testifying in this case.  He also denied looking into or applying for a visa or residency as a result of his involvement in this case.  Roberto testified that he had "just found out" that applying for a visa or residency as a result of his status as a victim in this case was an option for him, but he had not applied for it.

The trial court then ruled that it was prohibiting any questions on the issue.

### No Abuse of Discretion on the Part of the Trial Court

A trial court's order is presumed correct and the appellant has the burden to demonstrate the court committed reversible error.  (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 694.)  Relevant evidence is admissible evidence (Evid. Code, §§ 350, 351), and can include "evidence relevant to the credibility of a witness."  (Evid. Code, § 210.)  "As a general matter, a defendant is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias."  (*People v. Brown* (2003) 31 Cal.4th 518, 544.)  Indeed, statutory authority provides that impeachment evidence regarding a witness's motivation to lie can be deemed relevant to prove a disputed material fact.  (See Evid. Code, §§ 210, 780, subd. (f).)

44.

However, although " '[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' [citation], such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance' [citations]." (*People v. Brown, supra,* 31 Cal.4th at p. 545.) It is well established that a trial court has substantial discretion to exclude collateral evidence used to attack witness credibility (*People v. Thornton* (2007) 41 Cal.4th 391, 428-429), and "a trial court's [evidentiary] ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, overruled on another point by *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

We find the circumstances shown by the record do not support an argument that the trial court abused its discretion in making its ruling. We acknowledge that a witness's desire to obtain a visa could color his testimony and, under some circumstances, be compelling evidence of bias. Here, however, the evidence to support an inference of bias or motive was weak.

There was no evidence that either Luis or Roberto applied, or intended to apply, for a U visa, nor is there any evidence either was aware of the U visa program at the time, or that their testimony at trial was materially inconsistent with their initial statements to police or their preliminary hearing testimony. The issue of whether Luis and Roberto were aware of or intended to apply for a U visa was therefore a collateral one and had no direct relationship with the facts surrounding the alleged crimes. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 9.) The relationship between Luis and Roberto's credibility as a witness and a potential motivation to testify untruthfully based upon benefits theoretically available through a U visa was too tenuous to make the issue relevant for cross-examination at trial.

In his argument, Villasenor cites to three out-of-state cases to argue error occurred. We find the cases unpersuasive because their circumstances bare little similarity to the material circumstances of this case. First and foremost, all of the cases cited to by Villasenor involved circumstances in which the alleged victim had already applied for a U visa by the time of the defendant's trial. (*Romero-Perez v. Commonwealth* (Ky.Ct.App. 2016) 492 S.W.3d 902, 904 (*Romero-Perez*) [At trial, during prosecution's case-in-chief, defendant sought to cross-examine alleged domestic violence victim about the fact that she had applied for a U visa]; *State v. Del Real-Galvez* (Or.Ct.App. 2015) 270 Or.App. 224, 226 ["As defendant's case proceeded to trial, [sexual abuse victim's] mother applied for a U visa to remain in the United States and based her application on [victim's] allegations that defendant had sexually abused and coerced [victim]"; *State v. Valle* (Or.Ct.App. 2013) 255 Or.App. 805, 807 ["During the trial in this case, defendant sought to cross-examine [alleged sexual abuse victim] about the fact that she had applied for the U visa"].) Indeed, in *Romero–Perez*, the fact that the victim's U visa application was pending before the trial court at the time of trial was cited by the appellate court as the primary basis for finding error in the trial court's exclusion of cross-examination regarding the U visa. (*Romero-Perez, supra,* 492 S.W. at p. 903.) In contrast here, neither Luis nor Roberto had applied for a U visa.

In sum, the cases cited by Villasenor do not persuade us that the trial court committed error when it ruled to prohibit cross-examination about Luis or Roberto's possible intention to apply for a U visa or some sort of immigration relief.

*Evidence Code Section 352*

A balancing of the probative value of the cross-examination at issue against its potential prejudice, pursuant to Evidence Code section 352, also supports our conclusion to affirm the trial court's ruling. Evidence Code section 352 authorizes a court to exercise its discretion to exclude evidence if the evidence's probative value is substantially outweighed by its prejudicial impact.

In *People v. Villa* (2020) 55 Cal.App.5th 1042 (*Villa*), the Fourth District affirmed a trial court's decision to exclude evidence that a victim had an outstanding application for a U visa at the time of trial. (*Id.* at pp. 1047-1048.) At an Evidence Code section 402 hearing, the victim stated that she learned about the U visa program after she testified at the preliminary hearing. (*Villa*, at p. 1048.) She completed the U visa application and "understood she would have to cooperate with the prosecution of the case, testify if she was subpoenaed, and testify truthfully." (*Ibid.*) The trial court excluded the evidence under Evidence Code section 352, finding that its probative value was "far outweighed by 'the tendency of that particular item to open up a massive inquiry requiring an undue consumption of court time and tending to confuse issues and invite jury speculation.' " (*Villa*, at p. 1048.) Recognizing that the victim's application for a U visa was relevant impeachment evidence, the trial court observed that the victim's trial testimony was similar in all material respects to her preliminary hearing testimony during which she was unaware of the U visa process. (*Id.* at p. 1052.) The trial court then balanced the limited probative value of the evidence against the " 'huge chunk of time' " necessary to evaluate the victim's motivation such as whether she changed her story after the preliminary hearing when she learned of the U visa program, her beliefs about what the prosecution expected from her, and the status of her application. (*Id.* at p. 1053.) The trial court affirmed the exclusion of the evidence, explaining that, among other reasons, the evidence could prejudice the jury against the undocumented victim. (*Ibid.*)

Villasenor attempts to distinguish *Villa* from his own case, noting that the trial court in *Villa* conducted an analysis on the record pursuant to Evidence Code section 352, which was not done here. However, even if a trial court does not conduct such an analysis, the section provides grounds to affirm the correctness of the trial court's ruling on appeal. (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

47.

Accordingly, we find the marginal probative value of cross-examining Luis and Roberto about any possible intention to apply for a U visa was substantially outweighed by the probability that the issue would have created a substantial danger of undue prejudice at trial. (Evid. Code, § 352.) First, the collateral nature of the issue, by itself, minimized its probative value and emphasized the possibility of it prejudicing or confusing the jury. (See *People v. Lavergne* (1971) 4 Cal.3d 735, 742.) It is also clear the proffered cross-examination issue presented a significant potential for prejudice because it would have involved discussing Luis and Roberto's right to be present in this country. (*Romero-Perez, supra,* 492 S.W.3d at p. 906 ["In short, the U visa creates a pathway whereby an illegal immigrant may be able to obtain lawful permanent residency within three years"]; cf. Evid. Code, § 351.4 ["[E]vidence of a person's immigration status shall not be disclosed in open court" prior to an in camera hearing conducted to determine the admissibility of the evidence].) Indeed, our Legislature, enacting Evidence Code section 351.4 (Stats. 2018, ch. 12, § 2), recognized that the issue of illegal immigration is a sensitive one in this state. (*Id.* § 3, reprinted at Historical and Statutory Notes, 29B pt. 1A, West's Ann. Evid. Code (2019 supp.) foll. Evid. Code, § 351.4, p. 53 ["In order to immediately help protect undocumented residents of California and their ability to participate in the California justice system, it is necessary that this act take effect immediately"].) Accordingly, we find no abuse of discretion on the trial court's part in ruling to exclude the evidence, because the probable prejudicial effect of the proposed cross-examination issue substantially outweighed its probative value pursuant to Evidence Code section 352.

## DISPOSITION

We reverse the gang enhancements and the gang substantive offense and remand to allow the People the option of retrying the gang enhancements and gang substantive offense under the amended law, and for resentencing in accordance with section 1170 as

48.

amended.  We reject Ulloa's other claims of error, and affirm the judgment in all other respects.

 

FRANSON, J.

WE CONCUR:

HILL, P. J.

SMITH, J.